May it please the court, I'm Allison Clare on behalf of Mr. Cook. The district judge properly found in this case that the trial prosecutor was pervasively influenced by his own racial bias throughout jury selection. And I think that's demonstrated in a myriad of ways related to each of the seven strikes that are at issue. I'd like to focus this morning on the strikes of jurors Parker and Maxey, because either of them provides a strong basis for granting relief on the Batson claim, in the alternative to Ms. Watkins, who's been briefed quite thoroughly. Ms. Clare, did you say that the trial judge found that the prosecutor was biased? No, Your Honor. The district court found, as one circumstance in the analysis, and this is not the ultimate conclusion as to purposeful discrimination, but the magistrate judge found, and the district court adopted the finding, that there was pervasive bias that he brought his own stereotypical assumptions about African Americans to bear, and that was demonstrated in his inaccurate basis for some of the reasons he gave for each of the strikes were inaccurate. Others of them distorted what the jurors had said. Others of them seemed to have been fabricated. All of that was attributed to a prejudice that I believe forms the most important circumstance in the totality of circumstances as to all seven strikes. Turning to Ms. Parker in particular, she is the woman who ---- But doesn't that constitute the finding of a pattern? And the magistrate judge said, I don't find a pattern here. The magistrate judge concluded ---- I'm trying to understand the distinction that you're trying to draw, and you've lost me. The magistrate judge found that there was a bias in the prosecutor's own thinking about race. He injected race where jurors had not raised it. He viewed the African American jurors through a lens of suspicion that was racially biased, and that's one of the factors that we rely on in establishing purposeful discrimination in the final analysis. Is that the same thing as saying that the defendant made a prima facie case? The prima facie case here was primarily a statistical one. When the first Wheeler motion was made, the prosecutor had excused six out of eight African Americans, and he subsequently excused a seventh. That was the prima facie showing. The prosecutor's own statements revealing stereotypical ideas about African American jurors are evidence of purposeful discrimination at the third step in the way that in Kessler, the prosecutor's statements about the inability of Native American jurors to follow the rules of our legal system demonstrated his prejudice. And our analysis here, I think, very much follows from that in Kessler. We have a multitude of reasons that were given for each strike, and as to each of the reasons that were given, simply do not hold up under scrutiny. And when you compare that with the prosecutor's own injection of race into the proceedings, the inference is that he was motivated by discrimination. Alito, I must confess, I do not have directly in front of me the report and recommendation of the magistrate's office. Could you give me just a citation to the page where the ---- It's in the brief, Your Honor. I don't have that particular page to have. I can look at it. If it's in the brief, we'll move on. It's in the brief. Turning to Ms. Parker, she's the one who was a homemaker and stay-at-home mother, and the prosecutor said that meant she would not be able to assess witness credibility or work with other jurors. The magistrate judge said, and I can give you the quote for this, it's pages 27 to 28 of tab 2, which is the findings, I beg your pardon, yes, findings and recommendations of tab 2. He called that a dubious sociological assertion, suggested pretext in light of Steed's otherwise existing bias. And I think it's more than dubious. For one thing, it is flatly contradicted by the record. This juror had served previously on a criminal jury that reached a verdict. She was asked about that on board here. In the McLean v. Printy case, which is cited in the brief, a prosecutor also said observing this prospective juror, I don't think she can work well with others. Same thing Steed said about Ms. Maxx – Ms. Parker, I beg your pardon. When Cook's counsel, trial counsel, pointed that out, what was the prosecutor's response? Well, he jumped to some of his other reasons, which weren't to my notes, he had no response. When he said the reason I struck her is because she's a homemaker and I don't think she's used to dealing, interacting with other people, Cook's response was, hey, she's been on a jury that reached a criminal jury that reached a verdict. My information, and I could be wrong about this, is that the prosecutor had no response to that. You are correct with that, Judge Hawkins, and thank you for refreshing my memory, because I think that, again, that indicates that this prosecutor could not articulate when challenged an explanation for having given, in effect, a false reason. The other reasons that he did give are extremely weak. He said that she didn't like accomplice testimony. And while it's true that she had some reservations about it, three seated jurors, numbers 5, 6, and 14, had written on their questionnaire that they disapproved of the idea of accomplice testimony or thought that it encouraged witnesses to lie or thought that it wasn't fair to give deals to snitches. And that inconsistent application of this particular reason also weighs against its credibility as a true reason for the strike. Remember, too, Ms. Parker is the one who didn't talk about race at all, even though she'd been asked about it extensively in the questionnaire. She didn't bring up any attitudes that she held about the role of race in society or in the criminal justice system. But Mr. Steed, when explaining his concerns about her, speculated from the fact that she left blank the question on the form that asked for race, that this meant she had some sort of a hidden racial agenda. Now, that requires a number of inferential leaps that I think are rather remarkable. First, he has to assume that it was a deliberate omission, which he did not ask her. And then he assumed from the fact that the omission was deliberate that perhaps it was motivated by her having found the question offensive. Now, certainly that is possible. It's also quite possible that since that exact question is usually optional in government forms, that it had nothing to do with her finding it offensive. He leaps from the supposition that she was offended to the idea that she possessed, quote, a racial slant that might not be in the best interest of the people in this case. Especially in light of his, Steed's concerns about the racial attitudes of other African-American jurors, I think this is very strong circumstantial evidence that Steed was operating in this case from his own impermissible assumption that African-American jurors cannot be fair to the prosecution. And I'd like to observe that. Scalia. It would be pretty hard to describe it as a hidden agenda once she appeared for jury service. Anderson. I beg your pardon? Scalia.  for jury service. Anderson. Absolutely. And again, she had served as a juror before. She was willing to serve on this case. And none of the reasons for striking her hold up under scrutiny. I'll reserve the rest of my time. Okay. Counsel, before you come up, sometimes the time that we allot for cases is simply not enough. If you would like a couple of minutes to talk about the other juror you mentioned, I will give you the opportunity to do that. I'll give extra time to the State, or you can just sit and wait. Okay. Why don't we put two minutes on the clock, and then when the State comes up, make sure they have 12. Ms. Maxie was the sort of juror that I would imagine both sides would normally like to see. She was married. She had a good job as a personnel analyst with the State. Her husband had a good job. They owned their own home. High school graduate, some college education, member of her church. There are two things that are primarily at issue, although, again, many weak reasons were given. One, the prosecutor mentioned, and the State has emphasized, that a hardship request was denied. The same issue came up in Kesser, where the prosecutor said, well, this person didn't really want to serve. Mr. Steed raised it repeatedly regarding some of the black jurors. But the fact is that four seated jurors indicated on their questionnaire that they didn't want to miss work or didn't want to be inconvenienced by jury service. None of them were black. You're talking now about Maxie? I'm talking about Ms. Maxie, yes, Your Honor. And one of the reasons the prosecutor gave was that, is this a he or she? She. She had some concerns about the honesty of some law enforcement officers? Correct. She wrote that not all are honest, which many other jurors indicated. She said that all, both law enforcement and civilian, must stand on their own merit. She said that she would neither favor nor disfavor. Didn't it turn out that she had some relatives in law enforcement? I believe that she did. And she also affirmatively approved of accomplice testimony, which was key to the prosecutor in this case. Now, she's the one as to whom the prosecutor said that a key reason he didn't want her was that she was, in his words, not hers, addicted to the O.J. Simpson trial. And the jurors were asked on the questionnaire how closely they had followed the case, and she did say that she watched almost nightly. Now, setting aside the fact that I think calling that an addiction both overstates and adds some negative connotations unnecessarily, the fact is that Juror No. 1, who was a white juror, wrote on her questionnaire that she watched whenever she could. She was not considered to be addicted. And the only inference I can draw from that is that Mr. Steed had a problem with a black juror watching the O.J. Simpson trial closely. He did not have a problem with a white juror who did the same. And again, when you add that to the other weak examples that are given, an ex-husband who used marijuana, well, six, six seated jurors, 50 percent, had close friends or relatives who had used drugs in the past. Four of those people described their relative's drug use as a problem. Two of those seated jurors acknowledged that they had used marijuana themselves when they were younger. So clearly. Alito What do we do with the reason that he offered about witnessing the and filing a complaint about excessive force by a police officer? O'Connor Yeah. That was addressed. The excerpt of the voir dire is in your excerpts and is cited in the briefs. And she mentioned that that had happened. She did not originally think of it. It wasn't on her. I beg your pardon. It was on her questionnaire. But when questioned about it, she did not seem overly concerned. She said, this is what I saw. I don't know what happened. I don't have any feelings about it. And it will not influence me in this case. And so to rely on that thin read and say that was why he struck her. Alito Well, you call it a thin read. She said that she reported it. So she was obviously concerned about it at the time that nothing was done about it. And the prosecutor. O'Connor And she also wasn't concerned about it. Alito And then the prosecutor said that the reason that I was concerned was because she might take it out against the district attorney or law enforcement for not having adequately responded to the complaint. O'Connor And she did state on voir dire that she had not made any attempts to follow up and find out what happened in that case. She simply had never been contacted about it. So she did not have an agenda to find out what had happened with this case or to ensure that prosecution ensued. So, again, I think that Steed's fear about what she would do, given that experience, was based more on his own prejudices than on anything the jurors said. And I still do need to save some time for my model. Roberts. Thank you. Twelve minutes on the clock for the State, please. Counsel. May it please the Court. Ward Campbell for the appellee. Apparently, Mr. Cook's targets have shifted a little bit from Watkins to the two jurors, Parker and Maxey. I would note that the district court below even found that there was no indication that there were any pretextual reasons, ultimately that their excuses were not pretextual. And in both cases, the prosecutor giving all of the various reasons, listing the various reasons for all the jurors, and including Parker and Maxey, indicated which ones he thought were truly the significant or compelling ones from his standpoint in terms of exercising his peremptory challenges. And those reasons were, in fact, materially distinguishable from other jurors in the case who were excused or not excused. In particular, involving Parker, although he mentioned the concern about her not filling out the aspect of the questionnaire regarding racial ethnicity, he indicated that really was not an important or significant thing, except it was something he noted in talking about the juror. When he was asked, he said that he had three reasons. The first one was, she's a homemaker, and she might not be able to interact with other people in group decision-making. And Cook responded that she had served on a jury to verdict a criminal case, and the prosecutor didn't respond. What do you make of that? Well, I make of that, I think the prosecutor made a very general response. I mean, I think the way this worked, I think the prosecutor was the general response. Well, the prosecutor made a general summation after he heard all the criticisms of his various challenges. I don't think he really did respond specifically to really hardly what was said about any of the particular jurors in this case. I think he let the record rise or fall based on what was presented and what the trial judge considered. I'm not too sure it's very significant, given how the arguments were made at the trial court, that the prosecutor didn't have a specific response to that. The significant thing is, is that, in fact, that type of experience, the type of employment, is, in fact, considered a legitimate race-noodle explanation. And, furthermore, that's coupled with the fact that Parker did indicate that she did not believe that you could determine a defendant's state of mind, that she had concerns about how you were able to do that. This was a conspiracy case, for instance, in which state of mind or whatever was going to be very significant. And although she ultimately, right, you know, did indicate that she could understand or accept the instructions about accomplice testimony, she did, in fact, indicate skepticism about the credibility of accomplice testimony. Those are all three legitimate race-noodle reasons for excusing that particular juror. The fact that she may have other reasons that would indicate she would be a desirable juror does not necessarily mean that the prosecutor was being protectual in excusing this particular juror. But the first words out of his mouth for excusing Parker is that she couldn't interact properly. And when it was pointed out that she sat on a jury to verdict in a criminal case, by the way, was that a conviction? I honestly don't remember. I'd have to look at the question. I think the questionnaire asked for that. I have the questionnaire. The prosecutor has no response to it. There is. To my knowledge, there is no response to that particular point. But the fact is that was not the only reason the prosecutor gave for excusing this juror. And the fact that she, no matter what her other experiences were as a juror, her concerns about both the ability to indicate or determine the state of mind of a defendant and her concerns about accomplice testimony in this case would also be factors that would influence ultimately this particular prosecutor's concerns about her as a juror. And this prosecutor was certainly entitled, notwithstanding whatever her other experience was, to rely on his own experiences, his own perceptions of her as a juror. So I think that the fact is that no court, no court has found that there was a pretext involved with this particular juror. The reasons were given were race-neutral, and they were supported by the record, and they were found to be so at all three levels of review we've had so far in this case. Similar with Juror Maxey. The fact is that she was, she did go to the trouble to ask, actually ask for the hardship challenge. And that distinguishes her from other jurors who may have had some concerns about serving on a jury, but did not seek a hardship. I thought there was a white juror who was not struck who had also submitted a hardship request. Am I wrong about that? I think, oh, there were lots of jurors who asked for hardships. But the point is, is that that, once again, that's not the only factor that plays into Maxey. The idea also is that Ms. Maxey, as it was agreed, was someone who had, in fact, followed the O.J. Simpson case closely, and that that was a factor that was a concern to the prosecutor, and I think justifiably so. And finally, the bigger concern was that she had also had seen an assault and had reported it and thought nothing had come of it. Nothing had come of the report. And that raised concerns of the prosecutor that she would be skeptical or something. Why would following the O.J. Simpson case be an indication of how a person felt about the O.J. Simpson case? There's actually been, in effect, I cite it in the brief, there's been some interesting discussion about how the effect of the wide viewership of the O.J. Simpson case, in fact, affected people's attitudes about the criminal justice system, in many ways, in adverse ways, because of the number of things that happened in that case. And it's something that, in fact, has probably contributed to skepticism about the criminal justice system. And, in fact, that's been a concern that you'll read about in academic journals and among, I think, prosecutors and defendants on both sides. I thought the most widespread reaction to the Simpson trial was people saying that they would respond to jury calls and they would make sure that they served on juries when they had an opportunity to do so. Well, Your Honor, I think that there has been, in fact, a lot of study done that it also, though, exposed a lot of potential problems, perhaps some of them correct, some of them perhaps misperceptions about the criminal justice system, the way prosecutions are run, the way defendants are run. You saw it with another juror who was excused, who thought the lesson from the O.J. Simpson case was that if you have wealth, you're able to get acquitted. In fact, it contributed to a lot of different perceptions, some of them correct, incorrect, about the ---- Was Maxie asked about that? She was ---- it was merely ---- it merely came out that she said she watched it. I think in her questionnaire that she watched it almost nightly, I think, was the only way to get it. Didn't she say that it wouldn't influence her impartiality? She was asked about that and said so. Okay. But once again, it's the ---- it's not necessarily the prosecutor's prerogative to take all of that at face value. And the Court obviously had paid close attention to that as well, since, in fact, he's the one that corrected the prosecutor about saying that she had watched it almost nightly instead of being addicted to it. I think it stands to reason that this is considered a legitimate reason at the time as another factor, nonprotectional reason for excusing Juror Maxie. Are we a mixed-motive circuit? I don't think this Court has actually adopted that rule. I think that's that was left open in Kessler v. Canberra, which is what, of course, the district court noted when it ultimately adopted it. Did the district court apply a mixed-motive? It did. It did apply a mixed-motive analysis. And the district ---- the findings and recommendations did, and the district court adopted that analysis. So unless there are any more questions, I would submit them. Roberts. No. I don't see any. Judge Hugg, do you have any more questions? No. No. Thank you. Counsel, thank you for your argument. I appreciate it. I appreciate you coming in. You have about a half a minute. Well, then, I'll just correct one thing that opposing counsel said. He said that the district court had not found pretext as to any of the seven strikes. Now, what Judge Carlton did or the magistrate did, obviously, isn't dispositive since your review of the claim is de novo. But Judge Carlton said, but for applying mixed-motives analysis, I would find a batting violation and grant relief here. That has to mean, without mixed-motives analysis, what you've got is pretext analysis, which means that Judge Carlton found pretext as to the reasons for excusing Ms. Watkins. I think the record is just as strong as to Ms. Parker's case. The only thing I don't understand about what he did, and maybe I don't understand the mixed-motive analysis very well, because I don't think it really fits in this case, but as I understand how it would apply, if there were any number of reasons, including a race-neutral reason, that's good enough. And, therefore, if there's one legitimate reason amongst them, then you sort of excuse in the absence of, I guess, a pattern finding. Well, properly applied mixed-motives analysis would not give the prosecutor the benefit of the doubt simply for articulating one out of the many reasons. No, no, no. You'd have to find it was a legitimate reason, not what's the inequity. You'd have to find that the – it's an affirmative defense in every other context. And the prosecutor would have to say, okay, even though you've concluded either I have admitted or you have concluded that my concerns about the unfairness of African-American jurors as a group led me to give reasons X, Y, and Z for excusing this juror, reason A is separate from that, and I would have struck her on reason A grounds even if she were white, even if the other things didn't exist. And the prior fact has to be persuaded, as do the prosecutor's credibility about the assertion of that affirmative defense. Obviously, no such assertion of an affirmative defense was made at the Batson hearing. You cannot, I think, in post-conviction review make a determination on the record as to Mr. Steeve's credibility in that regard. That credibility has been so undermined in every other part of the claim. Thank you very much. Thank you both for coming in today. It's a very interesting case. It will be submitted for decision.
judges: Hug, Hawkins, Tallman